OA 91  Criminal Complaint

# United States District Court

NORTHERN          DISTRICT OF          CALIFORNIA

UNITED STATES OF AMERICA
V.
ANH HAT TON a/k/a "Timmy"

CRIMINAL COMPLAINT

Case Number: 08-70583 RS

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about September 28, 2005 in Santa Clara County, in the Northern District of California defendant(s) did,

(Track Statutory Language of Offense)

knowingly and intentionally conspire with other persons to distribute a Schedule I controlled substance, to wit, 3,4-methylenedioxymethamphetamine, commonly known as MDMA, or Ecstasy,

in violation of Title 21 United States Code, Section(s) 846, 841(a)(1), and 841(b)(1)(C).

a. Maximum prison sentence - 20 years
b. Maximum fine - $250,000
c. Maximum supervised release term - 3 years
d. Mandatory special assessment - $100

I further state that I am a(n) Special Agent of F.B.I. and that this complaint is based on the following facts:

Continued on the attached sheet and made a part hereof:  ☒ Yes  ☐ No

Approved As To Form: /s/ AUSA

/s/ Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

9/3/08
Date

at San Jose, CA
   City and State

RICHARD SEEBORG
Name & Title of Judicial Officer

/s/ Signature of Judicial Officer



DOCUMENT NO. 1
CSA's INITIALS: c
DISTRICT COURT CRIMINAL CASE PROCESSING

AFFIDAVIT OF VINH D. NGUYEN IN SUPPORT OF CRIMINAL COMPLAINT

INTRODUCTION

In support of a criminal complaint, I, Vinh D. Nguyen, Special Agent of the Federal Bureau of Investigation (FBI), Department of Justice, San Jose, California, being first duly sworn, depose and say:

I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and make arrests for offenses enumerated in Title 21, United States Code.

I have been a Special Agent of the FBI for over five years. I am currently assigned to the San Jose Resident Agency of the San Francisco Division of the FBI. During my employment with the FBI, I have regularly investigated cases involving organized crime and narcotics. Furthermore, in the course of these investigations, I have participated in all the normal methods of investigation, including but not limited to, visual surveillance, questioning of witnesses, undercover agent activity, pen register installations, monitor court-authorized wiretaps, and secured other relevant information using other investigative techniques. I obtained an Electrical Engineering degree in 1994. After graduation, I practiced engineering in several different industries. In 2002, I joined the Orange County Sheriff's Department as a Deputy Sheriff in Orange County, California. I attended the 26-week California Peace Officer Standard Training (POST) at the Orange County Sheriff Academy. In 2003, I joined the FBI and attended the 17-week basic academy training in Quantico, Virginia. During this training, I had approximately four hours of organized crime training and approximately two hours of wiretap training. Since June 2003, I have been assigned to the Asian Organized Crime squad in San Jose, California. I have had over 200 hours of in-service training, specifically on organized crime, gangs, and electronic surveillance.

Based on the facts set out below, I believe there is probable cause to believe that Anh That TON, a/k/a Timmy is guilty of conspiracy to distribute 3,4 methylenedioxymethamphetamine, or MDMA, or ecstasy, in violation of 21 U.S.C. §§ 846 and 841(a)(1). All of the following information is either known to me personally or has been communicated to me by other law enforcement officers.

## CONFIDENTIAL INFORMANT (CI) INFORMATION

In January 2005, I met with a confidential informant (CI) who, according to SJPD, had provided reliable information since 2004. CI, who is in a position to testify, became a source of information for the FBI at that time.

I am unaware of any instance in which CI has given unreliable or false information to law enforcement. During the time CI cooperated with the government in obtaining criminal evidence against TON as described herein, CI did not ask for or receive any money for his assistance, nor did he demand or request any other law enforcement assistance in exchange for his cooperation.

## FACTS SETTING FORTH PROBABLE CAUSE

On January 13, 2005, CI reported that TON, known to CI as "Timmy", offered to sell CI ecstasy, cocaine, and other drugs. TON said that the minimum he would sell was 1,000 tablets of ecstasy (referred to as a "boat"), or increments thereof. The minimum transaction that TON would engage in for cocaine was one kilogram. CI had purchased small quantities of ecstasy from TON in the past.

On June 9, 2005, CI called TON and using the code word "candy," told TON that he wanted to purchase ecstasy. TON asked whether CI just wanted "one" (1,000 tablets). TON then said that he would call CI back. TON later called CI back and said that he had the "Pink I" (pink ecstasy tablets with the letter "i" stamped on them) and "Superman" (blue ecstasy tablets with the Superman logo stamped on them) types. TON told CI to call him back when he had the "paper" (money) ready. The calls between TON and CI were recorded and conducted in my presence.

1     Later that afternoon, TON phoned CI and asked about the status of the drug order. CI told TON that he needed a few days before making the order. This conversation was not recorded because I was not present.

    On June 20, 2005, at 8:30 p.m., TON called CI and asked whether he was ready to make the purchase. CI said he needed a few more days to get the money together and that he would let TON know when he was ready.

    On July 11, 2005, CI met TON at Bay101, a casino located in San Jose, California. TON offered to sell CI "ice", a form of high-purity methamphetamine. TON said that the crystal methamphetamine he had was of high quality and that he would only sell a whole pound per transaction or, at a minimum, half a pound. CI told TON that he would try to find a customer who was looking for that drug type.

    On July 15, 2005, at my direction, CI contacted TON to ask about purchasing one-half pound of "ice." TON told CI that a half-pound of "ice" cost "eight–nine" ($8,000 to $9,000). Sensing that CI was only checking the price, TON said to call him back when CI was sure he wanted to buy. This conversation was recorded and occurred in my presence.

    On July 20, 2005, at approximately 1:48 p.m., CI again called TON and said that he had a customer who wanted to buy a half-pound of "ice." CI stated that the customer was willing to pay $8,000 for the ½ pound, although that price was higher than usual. TON reassured CI that the customer would be getting a very high quality product for that price. As I had instructed him to do, CI then asked TON what his "cut" (share of the profit) would be for bringing the deal to TON. TON said that he would get something from the deal but did not indicate the amount. CI told TON that he would call him the next day when his customer was in town. This conversation also occurred in my presence.

    On July 21, 2005, at my direction, CI made a series of recorded phone calls to TON. In the first call, at 12:32 p.m., CI told TON that he and his buyer had the money ready to buy one-half pound of "ice" and asked to meet TON at about 2 p.m. TON said that this was not

3

possible because his "other boy" (contact) would not get out from work until later. TON suggested they meet between 5 and 6 p.m. CI replied that his customer wanted to leave town before traffic got bad. TON replied, "Let me call my boy. I'll call you back."

TON later called CI back and reported, "My boy told me if you want it, he had to do it at "7" (7:00 p.m.). TON added, "... my friend gets off at five and he lives 30 minutes away from here and he has to go pick it up and then come back here and give it to me." CI replied that his customer did not want to wait that long because the customer was nervous. TON said that he would call his contact again to see if he (TON) could go get the "ice" instead. TON then abruptly ended the conversation with CI and said that his contact was calling on the other line.

CI called TON back later and TON said he was expecting a call from his source in half an hour to let him know if the contact could do the deal sooner. TON said that he would call CI back later. These three calls were not made in my presence, but they were recorded. This was possible because CI called me first, and then dialed TON's phone using a three-way connection.

Later that afternoon, at my direction, CI recontacted TON and told him that the deal would not happen because his customer was afraid to wait around. TON was disappointed and said that if CI would have notified him the night before, he (TON) would have gone and picked up the "ice" to have it ready for CI. TON offered to pick up the "ice" that night and hold it for CI's customer until the next day. CI declined and said that he would set up the deal again at a later date. This call was made and recorded in my presence.

On September 26, 2005, CI called TON and said to TON, "I need some stuff (ice)." TON responded, "Oh, yeah, yeah, the little one or the big one?" (half a pound or one pound). CI requested a "QP of a ..." (a quarter pound of "ice"). TON immediately understood and said, "Oh, okay, okay, when do you need it?" CI told TON the next day and said that he wanted to pay "26" ($2,600) for the "ice." TON replied that he might be able to find that price from somebody, but that it would be "lower grade stuff." TON then said that he would ask and call CI back later that night. CI then asked whether TON could supply one-half pound of "ice"

4

for $4,000. TON said that he would check. TON then asked, "How about the other thing, the little thing?" (referring to ecstasy). CI said he would have to get back to TON about the ecstasy.

<u>SEPTEMBER 28, 2005: FIRST CONTROLLED PURCHASE OF ECSTASY FROM TON</u>

On September 28, 2005, CI made a series of recorded calls to TON. In the first conversation, CI asked TON if he could get a pound of crystal methamphetamine, referring to it as "window." CI offered to pay $4,000 up front and pay the rest a week later. It had already been established that the price for one pound of crystal methamphetamine was $8,500. TON said, "... it defeats the purpose of like, them giving me time on it. You get what I'm saying? They're giving me time to make paper on it. Not, you know, to give you and then you give me four. You get what I'm saying?" To further elaborate, TON said, "It's like, if you're going to pick up a, a Q, then you're going to pick up a Q dawg. I'm not going to give you a whole one and then let you have a week on it ..." In other words, TON wanted full payment for whatever quantity CI wanted to purchase: he did not want to "front" the drugs to CI. TON said it would be too much risk for him and that he would not want to be responsible if CI could not come up with the complete payment. Regarding the quarter pound, TON said he would have the methamphetamine ready the next day.

Because TON had offered to sell ecstasy to CI before, at my direction, CI made another recorded call to TON. CI asked TON if he had ecstasy, which the speakers referred to as "keo", a Vietnamese word meaning "candy". TON confirmed that he had ecstasy available and that a "boat"[1] would cost $3,500. CI said that he would need it soon. TON instructed CI to give him one hour's notice before he wanted to pick it up.

A short time later, CI made a third recorded call to TON and told TON to have the ecstasy ready for him after he finished work at 5:00 p.m. TON said this would not be a problem

---

[1] The term "boat" refers to 1000 tablets of ecstasy, or 3,4 methylenedioxymethamphetamine.

5

1. and to call him when CI had the "paper" (money) ready. When CI assured TON that he already had the money, TON then instructed CI to call him when he got out of work.

Later that evening, CI called TON to tell him that he was coming over to TON's house to pick up the ecstasy. This call was made in my presence. Before going to TON's residence, CI was provided with a concealed video and audio recorder and $3,500 in recorded bills. Under surveillance by agents, CI drove to TON's residence at 1526 Fall Avenue, in San Jose, arriving at 6:39 p.m. CI then called TON to say that he was outside. Agents saw TON meet CI in front of the residence. TON gave CI a plastic bag that contained approximately 1,000 tablets of ecstasy. The bag of ecstasy was hidden inside TON's car, a red Honda Civic. CI then gave TON the $3,500 cash. After this brief exchange, CI left the area, with agents following.

It should be noted that before CI went to meet TON, agents searched CI's person and vehicle to ensure that he did not have extra money or any other contraband. Inside CI's vehicle, agents found a small plastic bag containing two broken pink-colored tablets of an unknown substance, believed to be ecstasy. The bag and two tablets were taken into evidence. CI's possession of presumably controlled substances was a violation of guidelines I had set forth with him. CI stated that those tablets must have been in his car for a long time and he did not realize he had them in his car. Although CI violated guidelines that I had set for him, he continued to demonstrate that he was dependable and reliable, and provided information that was independently corroborated. Thus, CI was kept open as a source as he had otherwise fully cooperated with law enforcement to the best of his abilities.

Immediately after the buy, I counted the number of ecstasy tablets in the boat that TON had sold to the CI and determined that it was 40 tablets short. The CI phoned TON and told him this. TON agreed to make up the shortage to the CI later.

The DEA Laboratory determined that the boat contained 968.7 tablets at 79 milligrams of 3,4 methylenedioxymethamphetamine (or MDMA) per tablet, for a total of 76.5 grams of pure ecstasy.

6

Delivery of 38 tablets to CI of ecstasy on October 4, 2005

On October 4, 2005, the CI made a recorded phone call to Ton in which Ton agreed to make up the 40-tablet shortage and asked the CI to come over to his (Ton's) house in San Jose. The CI wore a body-wire and recorded the meeting inside Ton's house at which time Ton handed the CI a total of 38 tablets of ecstasy.

Sale of one boat of ecstasy to CI on November 4, 2005

On November 3, 2004, the CI made four recorded phone calls to TON setting up a purchase of one boat of ecstasy the following day for $3,500. TON stated that he had to drive his brother to Los Angeles that evening and therefore would arrange to have a friend deliver the boat to the CI the next day. Shortly before midnight, TON made an unrecorded call to the CI and said that TON's friend Hoa (later identified as Hoa Xuan Bui) would deliver the boat to TON the next day. The CI knew Hoa previously and also knew that Hoa was a good friend of TON.

On 11-4-2005, the CI made a recorded phone call to Hoa Bui's cell phone (TON provided Bui's phone number to the CI) and asked Bui to meet him outside TON's house in a few minutes.

A few minutes later, the CI - who was again wearing a concealed audio and video recorder - drove to TON's house. Shortly thereafter, Bui drove up in a Lexus that is co-registered to Bui's father and uncle at the same address in San Jose where Bui's driver's license is listed. Bui remained inside the Lexus and popped open the trunk, where the CI retrieved a plastic bag containing a boat of ecstasy. The CI walked up to Bui and handed him $3,500 cash.

The DEA Laboratory later determined that the boat contained 1,011 tablets at 61 milligrams of 3,4 methylenedioxymethamphetamine, or ecstasy, per tablet, for a total of 61.6 grams of pure ecstasy.

Sale of one boat of ecstasy to CI and FBI UC agent on November 30, 2005

On November 29 and November 30, 2005, the CI made several unrecorded phone calls to TON setting up a purchase of one boat of ecstasy on November 30, 2005 and the

7

introduction to TON by the CI of the CI's customer, "Tony Lee", an FBI undercover agent (UC). This deal took place in the afternoon of November 30, 2005 in the parking lot of a McDonald's restaurant in San Jose. During the six-minute meeting, the CI introduced the UC to TON as the owner/manager of several nightclubs in the New Orleans area and a large ecstasy and cocaine trafficker. TON gave the UC his cell phone number and became immediately interested in the UC, in particular in possibly working for the UC at a nightclub that the UC said he was considering opening up in the Bay Area. While inside his parked car, TON sold the CI and UC one boat of ecstasy for $3,500 cash.

The DEA Laboratory determined that the boat contained 1,018 tablets at 77 milligrams of 3,4 methylenedioxymethamphetamine, or ecstasy per tablet, for a total of 78.3 grams of pure ecstasy.

On December 3, 2005, the UC and Ton met for dinner at a sushi restaurant on Santana Row in San Jose that Ton chose. Ton said that he wanted to become as big a drug dealer as he believed the UC was and that he could provide the UC with five boats of ecstasy at a time. Ton said that two years earlier, he (Ton) traveled to Texas every week to deliver drugs there. Ton said he made a lot of money from this but partied it all away.

<u>Sale of one boat of ecstasy to FBI UC on February 2, 2006</u>

In late January 2006 and February 2, 2006, the UC placed recorded phone calls to TON arranging to buy one boat of ecstasy from him in the afternoon of February 2, 2006. The deal took place in the same McDonald's parking lot in San Jose as where the November 30, 2005 deal occurred. TON drove up alone to where the UC was parked and said that the boat was just a block away with TON's source. TON invited the UC to go with him to meet the source but the UC turned down TON's offer. TON drove a block away to meet his source and pick up the boat of ecstasy, which TON then drove back and delivered to the UC for $3,500 cash.

1  The DEA Laboratory determined that the boat contained 996.6 tablets at 41
2  milligrams of 3,4 methylenedioxymethamphetamine, or ecstasy per tablet for a total of 40.8
3  grams of pure ecstasy.

## CONCLUSION

Based on the aforegoing, I believe there is probable cause to believe that Anh That TON is guilty of conspiracy to distribute 3,4 methylenedioxymethamphetamine, or MDMA, or ecstasy, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and request that the court issue a criminal complaint charging TON with said offense.

VINH D. NGUYEN
Special Agent
Federal Bureau of Investigation

Sworn to before me this
3rd day of September, 2008

RICHARD SEEBORG
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF CALIFORNIA

9